**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

NOEL JONES,

     Plaintiff,

v.

CITY OF VINELAND, GARY
MOLLIK, JOSE TORRES, POLICE
CHIEF TIMOTHY CODISPOTI, LOUIS
PLATANIA, POLICE OFFICER JAMES
DAY, WILLIAM BONTCUE, H.
CONNELLY, and JOHN DOES 1-10,

     Defendants.

CIVIL NO. 13-7132(NLH)(AMD)

**OPINION**

**APPEARANCES:**

PAUL R. MELLETZ
BEGELMAN ORLOW & MELLETZ
411 ROUTE 70 EAST
SUITE 245
CHERRY HILL, NJ 08034
    On behalf of Plaintiff

BRIAN H. LEINHAUSER
JOHN PATRICK MCAVOY
MacMAIN LAW GROUP, LLC
101 LINDENWOOD DRIVE
SUITE #160
MALVERN, PA 19355
    On behalf of Defendants

**HILLMAN**, District Judge

    This case involves claims of false arrest and excessive
force by law enforcement officers.  Presently before the Court
is the motion of Defendants for summary judgment.  For the

reasons expressed below, Defendants' motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff, Noel Jones, was arrested by Vineland Police Department officers on two occasions: December 1, 2011 (Arrest No. 1) and June 23, 2013 (Arrest No. 2).  Arising from these events, Plaintiff asserts claims for false arrest, excessive force, and assault and battery against the officers, and against the City of Vineland for fostering a policy of inappropriate use of force by police officers.

Plaintiff describes the incidents as follows.  On December 1, 2011, Plaintiff was a passenger in a vehicle that was driving around the City of Vineland.  The vehicle was stopped by Defendants Officers Gary Mollik and Jose Torres for having a defective passenger side brake light.  After the vehicle was stopped, Plaintiff and the driver were ordered out of the vehicle.  Plaintiff complied with the requests of Mollik and Torres to exit the vehicle.  Upon exiting the vehicle, Plaintiff was told that he was going to be patted down for safety reasons.  When inquiring as to why his pockets were being searched, one of the officers responded "shut up before I f**k you up."  Officer Mollik swung at Plaintiff with an open hand which caused him to flee.  Rather than fleeing the scene, Plaintiff ran in a

2

circular direction in an attempt to alert neighbors as to what was unfolding because Plaintiff feared for his safety due to Mollik's unprovoked assault.  Torres then proceeded to tackle Plaintiff to the ground.  While Plaintiff's hands were in front of him, Torres choked Plaintiff by utilizing a chokehold maneuver.  Plaintiff was unable to breathe.  While on the ground in a chokehold, Plaintiff felt pain on the right side of his face as he was being struck and kicked by Mollik.  Plaintiff maintains that he ultimately lost consciousness.  Plaintiff was transported to Vineland South Jersey Regional Medical Facility for treatment.  Plaintiff was diagnosed with having a fractured orbital bone and later with a fractured jaw.

On June 23, 2013, Plaintiff arrived in the City of Vineland at or around Landis and East Avenue by way of bus.  After departing the bus, Plaintiff spoke with other individuals standing near the bus stop.  As Plaintiff walked away from the conversation, Officers Platania and Day approached him.  The officers asked another individual whether Plaintiff had exited a bus, to which the individual responded "no."  Plaintiff was placed under arrest and handcuffed.

Plaintiff claims that he was tackled to the ground by the Officers when he refused to open his hands.  Plaintiff further contends that he was then assaulted by Platania and Day.

3

Sergeant Bontcue arrived on the scene and Plaintiff contends that Bontcue stomped on his hands, arms, and back.  Plaintiff was subsequently taken to the Vineland Police station, where Plaintiff was held in custody for approximately a day and a half.

Defendants relate a mostly different version of events.  On December 1, 2011, Officers Mollik and Torres stopped a vehicle in which Plaintiff was a passenger for a taillight violation. When the driver of the vehicle opened the glove box to produce paperwork for the vehicle's registration, Mollik and Torres observed a small digital scale which they associated, based on their experience, with the sale of drugs.  The officers asked both the driver and Plaintiff to exit the vehicle.  Mollik patted down Plaintiff and checked his pockets for contraband. Because Plaintiff protested and refused to allow Mollik to search him, Mollik called for backup.

After the officers called for backup, and while Plaintiff was being Mirandized, Plaintiff fled the scene to prevent an arrest.  The officers gave pursuit on foot.  Despite the fact that the officers advised Plaintiff to stop and that he was under arrest, he continued to run.  Ultimately, Mollik tackled Plaintiff to the ground.  As Mollik tackled Plaintiff to the ground, Mollik hit his knee on the pavement, which required

4

surgery and caused him to miss six months of work.[1]

Once on the ground, Defendants claim that despite Mollik's verbal commands that Plaintiff stop resisting, Plaintiff hid his arms under his body and refused to give up his hands so that Mollik could place him in handcuffs.  During this struggle, and when verbal commands proved unsuccessful, Mollik struck Plaintiff about the face three times in order to gain control over the actively resisting Plaintiff.  Plaintiff also resisted Mollik's efforts to gain control by pushing himself up off of the ground.  Torres then struck Plaintiff about the face three more times.  When Plaintiff continued to resist, Mollik utilized a rear headlock maneuver in a further attempt to subdue Plaintiff.  Plaintiff did a pushup with Mollik on his back at which time Mollik wrapped his legs around Plaintiff's torso. Torres took ahold of Plaintiff's left arm, but was unable to handcuff Plaintiff who continued to flail his arms and disregard the officers' instructions that he stop resisting.

Defendants contend that neither of them used full force in attempting to subdue and arrest Plaintiff.  Despite the use of physical force, Plaintiff continued to resist until the K-9

---

[1] According to Officer Mollik, he never regained use and full mobility of his right knee and, as a result of this injury, he is 25 percent disabled.

unit, Officer MacAfee and his partner Hasso, arrived and advised Plaintiff that the dog would be released if his resistance continued.  Plaintiff then gave up his hands and stated "I give up."

Once Plaintiff was successfully subdued, he was taken to the back of Officer Ramos' car.  While in the rear of Ramos' patrol car, Plaintiff began to move around significantly. Ramos shined his flashlight on Plaintiff and observed Plaintiff with a clear plastic bag in his hands, which he was attempting to stuff under his waistband in the back of his pants.  Ramos and Mollik opened the door and confiscated the bag from Plaintiff's hands.  The New Jersey State Police later confirmed that the confiscated bag contained cocaine and heroin.

Plaintiff was subsequently transported to the South Jersey Regional Medical Center for medical clearance for injuries to his face.  Plaintiff was diagnosed as having a fractured orbital bone and nose.  According to the intake patient report, Plaintiff denied any loss of consciousness.

Plaintiff was charged with, inter alia, "resisting arrest, specifically by refusing to give his hands and further attempt to escape a lawful arrest in violation of N.J.S.A. 2C:29-2A(3)[,]" aggravated assault on a police officer in violation of N.J.S.A. 2C:12-1b(5)a, as well as possession of various CDS with

6

the intent to distribute.

Prior to the incident on June 23, 2013, the owners of the private property located at 106 W. Landis Avenue, Vineland, New Jersey, commonly referred to as "the Vineland Bus Terminal," granted the City of Vineland Police Department power-of-attorney over the Property to enforce their no trespassing policy. Pursuant to its authority as attorney-in-fact, the City of Vineland Police Department's Street Crimes Unit, which consisted of Officers Selby, Day, Connelly, Bergamo and Platania (collectively "the Unit"), conducted an investigation of the Vineland Bus Terminal on June 23, 2013. In the months preceding the June 23, 2013 incident, the Unit had received information from numerous confidential informants as well as concerned citizens regarding illegal narcotics activity in and around the Vineland Bus Terminal.

As the Unit conducted the investigation, Officer Selby informed Officers Day, Connelly and Platania that a subject who each of the Unit members were familiar with from prior police contact was loitering around the front of the Bus Terminal building. Day and Platania were aware that this person, an admitted heroin user and middleman for the distribution of narcotics, routinely brokered transactions between drug dealers and drug buyers in exchange for free heroin. Selby also

informed Day, Connelly and Platania that he observed an African American male speaking with the middleman before the two of them walked together to the southeast corner of the Bus Terminal building.  After the middleman walked away from the African American male, the African American male walked toward and spoke briefly with an unidentified Caucasian female and then a Hispanic male who were also on the Property.  It was at this time that Officer Platania decided to enter the Property in order to speak with the four suspects.

As Officer Platania approached the Property from the north side, Platania noticed that the African American male suspect started walking through the east parking lot as soon as the suspect spotted Platania's patrol car.  Platania exited his patrol car and approached the African American male suspect as Day and Connelly moved toward the other three suspects.  From a distance, Platania inquired as to the African American male suspect's name.  The suspect hesitated and stated "Lee Jones."

Officer Platania, who was now much closer to the suspect, immediately recognized the suspect from previous police contacts as the Plaintiff.  Platania knew him to be a drug dealer who used the street name "Snowy."  Plaintiff had been arrested by the Unit for numerous narcotics related offenses.  The Unit frequently received information from informants that Plaintiff

was still selling narcotics in and around the City of Vineland.

When Officer Platania asked Plaintiff what he was doing on the Property, Plaintiff responded that he had just arrived on a bus from Bridgeton approximately ten minutes earlier.  Platania then informed Plaintiff that the Unit had power-of-attorney on the Property and anyone loitering was subject to arrest for trespassing.  Plaintiff, who had become visibly nervous and began breathing extremely heavily, yelled to other people present at the Bus Terminal asking that the subjects advise Platania that he just disembarked from a bus.  Platania inquired as to whether Plaintiff had a bus pass on him, and Plaintiff stated he did not.

Around this time, Officer Day, who had already taken one of the other suspects into custody for possession of heroin and drug paraphernalia, approached Platania and Plaintiff. Plaintiff encouraged Day to ask a nearby Caucasian man whether he witnessed Plaintiff get off of the bus.  When the nearby bystander failed to corroborate Plaintiff's story, Day advised Plaintiff that he was under arrest for defiant trespassing and immediately took ahold of Plaintiff's left arm.  Simultaneously, Day ordered Plaintiff to put his hands behind his back. Plaintiff pulled his arm from Day's grasp and pushed Day in the area of his chest and attempted to run away.

Officer Platania instantaneously tackled Plaintiff to the ground and placed Plaintiff in a compliance hold.  Day and Connelly were then able to gain control of Plaintiff's arms and placed him into handcuffs.  During this time, Plaintiff screamed to the nearby bystanders asking them for their names.  Platania searched Plaintiff's person and located a digital scale in his front right pocket of his pants.  Platania then advised Police Dispatch that he had one subject under arrest for resisting arrest at which time several patrol units and supervisors arrived on scene.

Officer Platania stood Plaintiff up.  Despite Platania's instruction that he calm down, Plaintiff became increasingly upset at the fact that he was under arrest and refused to comply.  Platania noticed that both of Plaintiff's hands were clenched.  Because the inside of Plaintiff's hands were empty when he was tackled to the ground, Platania became suspicious. Based on his training and experience, Platania believed Plaintiff had retrieved something from is body or clothing, as there were no items inside Plaintiff's pockets.  When Platania ordered Plaintiff to open his hands, the then-handcuffed Plaintiff began to run away.  Plaintiff took approximately four steps before Platania was able to grab ahold of him.  As Platania grabbed Plaintiff, they both fell to the ground as a

result of Plaintiff's forward momentum.  When Platania looked at Plaintiff's hands while on the ground, he noticed that Plaintiff was rubbing his finger against his palms in order to grind a white rock-like substance falling from his hands.  Plaintiff resisted Day and Platania's efforts to pull his fingers back to retrieve the any items in his hands.

Despite the efforts of Officers Day, Platania, and several other officers and supervisors, they were unable to open Plaintiff's hands.  Sgt. Bontcue, who had recently arrived on the scene, then took his expandable baton and gave two to three small strikes to Plaintiff's fingers which proved successful and the Officers were able to retrieve the suspected contraband. Day collected the white rock-like substance that fell from Plaintiff's hands while Platania stood Plaintiff up in order to better search his person.  Plaintiff was soon after transported to headquarters.

Upon arrival at police headquarters and after a brief pat down search, Plaintiff was advised to sit down and was handcuffed to the wall.  Plaintiff complained of pain to his head and arm at which time Officer Platania contacted Vineland Emergency Medical Services ("EMS") to respond to headquarters to treat Plaintiff.  EMS arrived and transported Plaintiff to the hospital.  Plaintiff was later released from the hospital and

11

medically cleared for incarceration.

Plaintiff was subsequently charged with possession of drug paraphernalia (digital scale) and hindering (giving false name), aggravated assault on police, resisting arrest with force and tampering with evidence, and possession of crack cocaine with the intent to distribute within 1000 feet of a school.  A Municipal Court Clerk approved this warrant and set bail at $35,000 at ten percent.  Plaintiff was later transported to Cumberland County Jail where he was lodged in lieu of bail.

On January 26, 2015, Plaintiff entered a negotiated guilty plea that encompassed several criminal cases pending against him, including the cases arising out of the events of Arrest No. 1 and Arrest No. 2.  It appears that Plaintiff entered a guilty plea to two counts of resisting arrest charge in the third degree in violation of N.J.S.A. 2C:29-2A along with two counts of possession of CDS.  Pursuant to the negotiated guilty plea, Plaintiff agreed to serve two to five years in a New Jersey State Correctional Facility for the four counts he pled guilty

to[2] in exchange for the dismissal of several other counts.[3]

Plaintiff filed a five-count complaint against the Defendant officers and City of Vineland, asserting claims for false arrest, false imprisonment, excessive force, conspiracy, municipal liability, and assault and battery. Defendants have moved for summary judgment on all of Plaintiff's claims. Defendants argue: (1) Plaintiff's false arrest and false imprisonment claims are barred by the doctrine of collateral estoppel and the Heck doctrine; (2) the undisputed facts demonstrate that the officers did not use excessive force during either of Plaintiff's two arrests; (3) the doctrine of judicial estoppel bars Plaintiff's excessive force claims; (4) Plaintiff has no proof to support his conspiracy claim; (5) the officers are otherwise entitled to qualified immunity; (6) Plaintiff has not provided any proof to support a municipal liability claim against the City of Vineland for failure to train its officers

---

[2] Plaintiff was initially scheduled to be sentenced by Superior Court Judge Malestein on March 2015. Although the sentencing date was adjourned on multiple occasions, Plaintiff was most recently scheduled to be sentenced on May 4, 2015. Plaintiff failed to appear in court on May 4, 2015. As a result, Judge Malestein enforced the plea agreement and issued a bench warrant for Plaintiff's failure to appear. It appears that Plaintiff began serving his sentence on May 5, 2015.

[3] We note here, for reasons that will be apparent *infra* regarding the Heck doctrine, two of the dismissed counts are charges of resisting arrest.

13

in the proper use of force; and (7) Plaintiff cannot support his state law assault and battery claim arising out of the December 2011 arrest.  Plaintiff has opposed Defendants' motion in its entirety.

## DISCUSSION

### A.   Jurisdiction

Plaintiff has brought his claims pursuant to 42 U.S.C. § 1983, as well as New Jersey state law.  This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

### B.   Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving

14

party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

15

**C.   Analysis**

For the reasons that follow, the Court finds that
Defendants are entitled to summary judgment on all of
Plaintiff's claims, except for his claims of excessive force and
assault and battery arising out of the December 1, 2011 arrest.

> **1.   Plaintiff's false arrest/false imprisonment and
> excessive force claims against the individual
> officers**

Before addressing the facts of the two incidents,
Defendants argue that Plaintiff's claims for false arrest/false
imprisonment and excessive force are barred by either the
doctrine of judicial estoppel, the Heck doctrine, or both.  For
the reasons discussed below, while they are largely moot because
we find probable cause existed for both arrests, we disagree
with these arguments.  Moreover, neither of these two doctrines
bar Plaintiff's claims of excessive force.

First, with regard to plaintiff's false arrest/false
imprisonment claims, "'[a]n arrest made without probable cause
creates a cause of action for false arrest under 42 U.S.C. §
1983.  In addition, where the police lack probable cause to make
an arrest, the arrestee has a claim under § 1983 for false
imprisonment based on a detention pursuant to that arrest.'"
Ference v. Twp. of Hamilton, 538 F. Supp. 2d 785, 800 (D.N.J.

2008) (quoting O'Connor v. City of Philadelphia, 233 F. App'x 161, 164 (3d Cir. 2007)); see also Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998) (citing Heck v. Humphrey, 512 U.S. 477, 484 (1994)) (explaining that a claim for false arrest covers damages only for the time of detention until the issuance of process or arraignment, and not more, and a false imprisonment claim relates only to the arrest and the few hours the arrestee was detained immediately following his arrest).

"Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt. Rather, probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995) (citations omitted). For a § 1983 claim based on false arrest, the inquiry is "not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).

17

For the December 1, 2011 arrest, Plaintiff was a passenger in a car that was pulled over because of a broken taillight. When the driver retrieved his documents from the glove compartment, the officers observed a small digital scale, which they associated with the sale of drugs.  The events that followed, detailed above, resulted in Plaintiff being charged for resisting arrest, aggravated assault on a police officer, and possession of CDS with intent to distribute.

For the June 23, 2013 arrest, the special unit performing an investigation of the bus terminal, over the course of several months, received information from informants and citizens regarding illegal narcotic activity.  The officers observed Plaintiff speaking with several people, including a known middleman who brokered transactions between drug dealers and drug buyers in exchange for free heroin.  The officer eventually recognized Plaintiff, who was trying to walk away by then, because he had been arrested previously by the unit for drug related offenses.  When asked for a bus ticket to confirm that he was lawfully on the property, Plaintiff could not produce one, and one of the bystanders did not corroborate Plaintiff's story at his request.  Plaintiff was arrested for defiant trespassing, with the subsequent events leading to other charges, including resisting arrest and possession of CDS.

18

These facts compel a finding that probable cause supported
both the December 1, 2011 and June 23, 2013 arrests.  See
Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("If an
officer has probable cause to believe that an individual has
committed even a very minor criminal offense in his presence, he
may, without violating the Fourth Amendment, arrest the
offender.").  This finding alone is fatal to Plaintiff's false
arrest/false imprisonment claims.

In addition to the existence of probable cause, Defendants
also argue that Plaintiff's false arrest/false imprisonment
claims cannot be maintained because a finding in his favor on
those claims would imply the invalidity of his guilty plea to
resisting arrest.  In Heck v. Humphrey, 512 U.S. 477 (1994), the
United States Supreme Court provided an example of an
unsupportable § 1983 action whose successful prosecution would
necessarily imply that the Plaintiff's criminal conviction was
wrongful:

> A state Defendant is convicted of and sentenced for the
> crime of resisting arrest, defined as intentionally
> preventing a peace officer from effecting a lawful arrest.
> (This is a common definition of that offense.) He then
> brings a § 1983 action against the arresting officer,
> seeking damages for violation of his Fourth Amendment right
> to be free from unreasonable seizures.  In order to prevail
> in this § 1983 action, he would have to negate an element
> of the offense of which he has been convicted.  Regardless

of the state law concerning res judicata, the § 1983 action
will not lie.

Heck v. Humphrey, 512 U.S. 477, 487 n.6 (1994) (internal

citations omitted).

While defendants' invocation of the Heck bar may be proper

in this case, we are unable to reach that conclusion on this

record.  It does appear from Defendants' submissions that

Plaintiff pled guilty to two counts of violating N.J.S.A. 2C:29-

2, Resisting arrest; eluding officer, which provides that a

person is guilty of a third degree offense if he "purposely

prevents or attempts to prevent a law enforcement officer from

effecting an arrest" and "[u]ses or threatens to use physical

force or violence against the law enforcement officer or

another," or "[u]ses any other means to create a substantial

risk of causing physical injury to the public servant or

another."

However, we know nothing else about those convictions and

the facts underlying them.  We do not know, for example, that

they relate to Arrest No. 1, Arrest No. 2 or neither of them.

Moreover, we do know that two additional counts of resisting

arrest were dismissed as part of the plea agreement.  Again we

do not know whether those dismissed counts relate to Arrest No.

1, Arrest No. 2 or neither of them.  Nor have we been provided

20

copies of the charging documents or transcript of a plea proceeding to determine what facts Plaintiff admitted to and which counts were abandoned with or with accompanying admissions by the Plaintiff.

It is generally true that a Plaintiff who pleads guilty to purposely attempting to prevent an officer from arresting him cannot later maintain a claim against the officer on the premise that the officer had no basis to arrest him. See Nelson v. Jashurek, 109 F.3d 142, 145 (3d Cir. 1997) ("[W]e believe that the Supreme Court intended to demonstrate that a civil suit for an unreasonable seizure predicated on a false arrest would be barred so long as a conviction for resisting the same arrest remained unimpaired.").

However, here we do not have similar assurances of the same symmetry between the convictions obtained and the claims asserted in this case for false arrest.  As Plaintiff points out, Heck does not bar all civil rights claims that merely relate to later convictions; rather, it bars only those claims that would necessarily undermine a criminal conviction.  Stated differently, the mere fact that Plaintiff pled guilty to some counts of resisting arrest as part of a plea deal does not mean that Heck necessarily bars all claims related to the dismissed counts.

21

For all we know on this record, the State could have
dismissed the resisting arrest counts arising from Arrest No. 1
and Arrest No. 2 in exchange for guilty pleas to other conduct.
Here, defendants have simply failed to provide enough
information about the guilty pleas for us to fully and
accurately assess to what extent Heck bars these claims.  See
e.g., Brenner v. Twp. of Moorestown, No. CIV. 09-219, 2011 WL
1882394, at *6 (D.N.J. May 17, 2011) ("Because Plaintiff pled
guilty to obstructing the administration of law – the very same
offense that Officers Mann, Jr. and Pascal arrested him for – a
finding that the officers lacked probable cause would
necessarily invalidate Plaintiff's guilty plea.  Therefore, Heck
forecloses Plaintiff's false arrest claim.").  We therefore
decline to enter summary judgment on the basis of Heck as to
Plaintiff's false arrest/false imprisonment claims.

Nor does the Heck doctrine bar Plaintiff's excessive force
claims.  See, e.g., Garrison v. Porch, 376 F. App'x 274, 278 (3d
Cir. 2010) (finding that Heck did not bar Plaintiff's excessive
force claim even though he pleaded guilty to simple assault on a
police officer, explaining that even though "the fact that
Garrison was acting in an unruly and threatening manner
certainly factors into the totality of the circumstances and may
have justified a greater use of force than would have been

22

reasonable had Garrison been peaceful and cooperative, it certainly did not dispense with the reasonableness requirement altogether"). Acknowledging this, Defendants argue instead that Plaintiff's excessive force claims are barred by the doctrine of judicial estoppel.

The doctrine of judicial estoppel, "sometimes called the 'doctrine against the assertion of inconsistent positions,' is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing 'fast and loose with the courts." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996) (citation omitted). "The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." Id. (citation omitted).

Defendants argue that Plaintiff's excessive force claims are barred because he pleaded guilty to N.J.S.A. 2C:29-2, where he admitted he "purposely prevent[ed] or attempt[ed] to prevent a law enforcement officer from effecting an arrest" and

23

"[u]se[d] . . . physical force or violence against the law enforcement officer." By pleading guilty to that offense, Defendants contend that he also admitted that the officers did not act unlawfully in making the arrest. Defendants argue that Plaintiff cannot now assert the opposite, and inconsistent, position that how the officers acted was unlawful.

Defendants' argument fails for two reason. First, the judicial estoppel doctrine applied under these circumstances is simply a different application of the <u>Heck</u> doctrine. <u>Heck</u> prevents a person who pleaded guilty to a crime from maintaining a civil suit that, if successful, would imply the invalidity of the conviction. In other words, under <u>Heck</u>, a person cannot be victorious in a civil suit based on a position that is inconsistent with that person's criminal conviction – e.g., pleading guilty to purposefully resisting arrest and then suing the arresting officer for unreasonable seizure. The application of the judicial estoppel doctrine in this case would yield the same result. Thus, because the <u>Heck</u> doctrine and the doctrine of judicial estoppel are effectively the same under these circumstances, Defendants cannot apply the judicial estoppel doctrine to make an end-run around <u>Heck</u>, which does not preclude an excessive force claim where a plaintiff has pleaded guilty to resisting arrest.

24

Second, the statute does not require Plaintiff to have
admitted that the officers did not act unlawfully in effecting
his arrest.  N.J.S.A. 2C:29-2 provides in relevant part:

Resisting arrest; eluding officer

> a. (1) Except as provided in paragraph (3), a person is
> guilty of a disorderly persons offense if he purposely
> prevents or attempts to prevent a law enforcement officer
> from effecting an arrest. (2) Except as provided in
> paragraph (3), a person is guilty of a crime of the fourth
> degree if he, by flight, purposely prevents or attempts to
> prevent a law enforcement officer from effecting an arrest.
> (3) An offense under paragraph (1) or (2) of subsection a.
> is a crime of the third degree if the person:
>
> (a) Uses or threatens to use physical force or violence
> against the law enforcement officer or another; or
>
> (b) Uses any other means to create a substantial risk of
> causing physical injury to the public servant or another.
>
> It is not a defense to a prosecution under this subsection
> that the law enforcement officer was acting unlawfully in
> making the arrest, provided he was acting under color of
> his official authority and provided the law enforcement
> officer announces his intention to arrest prior to the
> resistance.

N.J.S.A. 2C:29-2.  The only reference to an officer's unlawful
conduct is that it "is not a defense to a prosecution under this
subsection that the law enforcement officer was acting
unlawfully in making the arrest."  Thus, Defendants' argument -
that when Plaintiff pleaded guilty to N.J.S.A. 2C:29-2a(3) he
was required to admit that the law enforcement officers did not
act unlawfully in making the arrest - is unsupported by the

25

plain language of the statute.  The statute actually provides that even if a law enforcement officer acted unlawfully in effecting the arrest (which is Plaintiff's claim in this case), a person may still be guilty of the resisting arrest offense. Contrary to Defendants' argument, Plaintiff never admitted that the Defendant officers acted lawfully in effecting his arrest.

Absent admissions by the Plaintiff in the criminal proceedings that the officers did not use excessive force, Plaintiff's excessive force claims are not precluded under Heck or the judicial estoppel doctrine.  Consequently, the Court must assess the facts surrounding the two incidents to determine the viability of Plaintiff's excessive force claims.

As a primary matter, the qualified immunity doctrine governs the analysis of Plaintiff's Fourth Amendment claims against the individual Defendants acting in their personal capacity.  "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  Reichle v. Howards, --- U.S. ----, ----, 132 S. Ct. 2088, 2093 (2012).  In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the

right at issue "clearly established" at the time of the
defendant's alleged misconduct? Pearson v. Callahan, 555 U.S.
223, 236 (2009).  Courts are "permitted to exercise their sound
discretion in deciding which of the two prongs of the qualified
immunity analysis should be addressed first." Id.  It is the
defendant's burden to establish entitlement to qualified
immunity.  Kopec v. Tate, 361 F.3d 772 (3d Cir. 2004).

     With regard to Plaintiff's excessive force claim, in
determining whether excessive force was used, the Fourth
Amendment's "objective reasonableness" test is applied.  Sharrar
v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham
v. Connor, 490 U.S. 386, 396 (1989)).  The objective
reasonableness test "requires careful attention to the facts and
circumstances of each particular case, including the severity of
the crime at issue, whether the suspect poses an immediate
threat to the safety of the officers or others, and whether he
is actively resisting arrest or attempting to evade arrest by
flight." Id. (relying on Graham, 490 U.S. at 396; Groman v.
Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)).  "Other
relevant factors include the possibility that the persons
subject to the police action are themselves violent or
dangerous, the duration of the action, whether the action takes
place in the context of effecting an arrest, the possibility

27

that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Id.

The Court finds that Defendants are entitled to qualified immunity regarding the use of force in Plaintiff's June 23, 2013 arrest.  The Court also finds that material disputed facts remain regarding the use of force in Plaintiff's December 1, 2011 arrest that require resolution of a jury prior to the Court's determination of whether the officers are entitled to qualified immunity.

For the June 23, 2013 arrest, Plaintiff claims that after he was handcuffed at the bus terminal he was tackled to the ground and his hands were stomped on numerous times.  All of the evidence in the record, however, shows that Plaintiff tried to run away as he was being handcuffed, which caused Plaintiff and the officer to fall to the ground.  The evidence also shows that after he was handcuffed, Plaintiff refused to reveal the substance in his hands, which he was grinding, causing white rocks to fall.  Even though Plaintiff claims that his hand were stomped on, all the other testimony reveals that numerous attempts to pry open Plaintiff's hands did not work, and a couple baton strikes to Plaintiff's hands finally caused Plaintiff to release the substance, which was crack cocaine.

28

The evidence further shows that Plaintiff suffered no injury to his hands or body that required medical treatment.

All of the Graham factors weigh in favor of a conclusion that they acted in an objectively reasonable manner under the totality of the circumstances.  Plaintiff's self-serving statements about being tackled and stomped on are not supported by the credible evidence in the record and therefore are insufficient to create a genuine dispute of material fact. Accordingly, the individual officers involved in the June 23, 2013 arrest – Officers Platania and Day and Sgt. Bontcue – are entitled to qualified immunity on Plaintiff's excessive force claim relating to the June 23, 2013 arrest.[4]

The December 1, 2011 arrest of Plaintiff is a different story.  In this incident, the officers involved candidly admit that they used force in effecting Plaintiff's arrest. Defendants admit that (1) one of the Defendant officers tackled Plaintiff to the ground, (2) Officer Mollik struck Plaintiff in the face three times, (3) Officer Torres struck Plaintiff in the

---

[4] Plaintiff has asserted a claim of conspiracy pursuant to 28 U.S.C. § 1985 against the officers arising out of the June 23, 2013 arrest.  This claim fails for two reasons:  (1) Plaintiff has not provided any evidence to support a conspiracy claim, and (2) because the Court has found that Defendants did not violate the Fourth Amendment with regard to this arrest, it cannot be found that Defendants conspired to violate Plaintiff's constitutional rights.

face three times, (4) Officer Mollik put Plaintiff in a rear headlock, and (5) Officer Mollik wrapped his legs around Plaintiff.

Defendants argue that their use of force was reasonable under the circumstances to effect the arrest of Plaintiff who tried to run away from the scene and was violently resisting arrest, to the extent that Officer Mollik was permanently injured during the incident.  Defendants also argue that all use of force ceased once Plaintiff was subdued by the threat of the K-9 unit.  Plaintiff, however, maintains that he did not try to flee the scene, but rather ran in a circle to escape Mollik's attempts to strike Plaintiff during his pat-down and to alert the neighbors because he feared for his safety.  Plaintiff claims that he was kicked in the face, choked, unable to breathe, and lost consciousness.  He also suffered from a fractured orbital bone and fractured jaw.

It is clear that the December 1, 2011 incident was turbulent.  The Court cannot determine at this time whether the officers' use of force was objectively reasonable because the circumstances surrounding the incident are in dispute.  If taken as true, Plaintiff's version of events could support a finding that the officers' actions exceeded the bounds of reasonable use of force.  In contrast, if Defendants' version of events is

30

believed, then it could support the finding that their use of force was reasonable.

The parties' credibility is the key to determining what transpired on December 1, 2011. A jury – not this Court – must assess the situation as related by Plaintiff and Defendants and determine what happened on that day. For example, did Office Mollik threaten and attempt to strike the peaceably cooperating Plaintiff during the pat-down, which made him fear for his safety? Did Plaintiff run in a circle to alert the neighbors, or did he try to flee the scene? Did Plaintiff continuously resist arrest, or was he beaten while passively lying face down on the ground?

Even though the determination of whether an officer acted objectively reasonably or made a reasonable mistake of law, and is thus entitled to qualified immunity, is a question of law that is properly answered by the court, not a jury, the Third Circuit has recognized that a judge should not decide the objective reasonableness issue until all the material historical facts are no longer in dispute. Curley v. Klem, 499 F.3d 199, 211, 211 n. 12 (3d Cir.2007). To do this, "[a] judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of

31

qualified immunity." <u>Id.</u>  In other words, "[w]hen the ultimate
question of the objective reasonableness of an officer's
behavior involves tightly intertwined issues of fact and law, it
may be permissible to utilize a jury in an advisory capacity,  .
. .  but responsibility for answering that ultimate question
remains with the court." <u>Id.</u>

In this case, the Court must deny summary judgment and
employ the special interrogatory procedure for the jury to
resolve the disputed facts regarding Plaintiff's excessive force
claim arising out of the December 1, 2011 arrest.  Whether the
officers acted in an objectively reasonable manner in their use
of force on Plaintiff – and are therefore entitled to qualified
immunity[5] - can only be determined by the Court after a jury
assess the parties' credibility and resolves the factual
disputes.  <u>See, e.g.</u>, <u>Lamont v. New Jersey</u>, 637 F.3d 177, 184
(3d Cir. 2011) ("Even where an officer is initially justified in
using force, he may not continue to use such force after it has
become evident that the threat justifying the force has
vanished.").

---

[5] The parameters of the constitution's prohibition of excessive
force is firmly established.  Thus, the only issue for the Court
to ultimately determine is whether, as a matter of law,
Defendants acted objectively reasonably with regard to that
clearly established right.

**2.   Plaintiff's <u>Monell</u> claim against the City of Vineland**

Under <u>Monell v. New York City Department of Social
Services</u>, 436 U.S. 658, 694 (1978), a municipality cannot be
subjected to liability solely because injuries were inflicted by
its agents or employees.  Rather, "it is when execution of a
government's policy or custom, whether made by its lawmakers or
by those whose edicts or acts may fairly be said to represent
official policy, inflicts the injury that the government as an
entity is responsible under § 1983."  <u>Id.</u>  There must be a
"direct causal link between a municipal policy or custom and the
alleged constitutional deprivation" to support municipal
liability.  <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989).

In the Third Circuit, there are three situations where acts
of a government employee may be deemed to be the result of a
policy or custom of the governmental entity for whom the
employee works, thereby rendering the entity liable under §
1983:  (1) where the appropriate officer or entity promulgates a
generally applicable statement of policy and the subsequent act
complained of is simply an implementation of that policy; (2)
where no rule has been announced as policy but federal law has
been violated by an act of the policymaker itself, and (3) where
the policymaker has failed to act affirmatively at all, although

33

the need to take some action to control the agents of the
government is so obvious, and the inadequacy of existing
practice so likely to result in the violation of constitutional
rights, that the policymaker can reasonably be said to have been
deliberately indifferent to the need.  Jiminez v. All Am.
Rathskeller, Inc., 503 F.3d 247, 249-50 (3d Cir. 2007)
(citations omitted).

    A government policy or custom can be established in two
ways.  One way is if a plaintiff shows that a "'decisionmaker
possess[ing] final authority to establish municipal policy with
respect to the action'" issued an official statement of policy.
Jiminez, 503 F.3d at 250 (quoting Pembaur v. City of Cincinnati,
475 U.S. 469, 481 (1986)).  Another way is if a plaintiff
establishes that a course of conduct constitutes a "custom"
when, though not authorized by law, "'such practices of state
officials [are] so permanent and well settled'" that they
operate as law.  Id. (quoting Monell, 436 U.S. at 690).  Under
either method, a plaintiff has the burden of showing that a
government policymaker is responsible by action or acquiescence
for the policy or custom, and that the government acted, at a
minimum, with deliberate indifference to the purported
constitutional deprivation in order to ground liability.  Id.
(citations omitted).

In this case, Plaintiff claims that the City of Vineland
has a policy of not training its officers in the proper use of
force.  Other than this conclusory statement, Plaintiff has
failed to produce any evidence to support his theory.  That
Plaintiff characterizes the deposition testimony of Chief of
Police, Timothy Codispoti, regarding various practices used by
the Vineland Police Department to be evidence of an excessive
force policy simply because he deems those practices to be
unlawful, cannot support a <u>Monell</u> claim against the City of
Vineland.  <u>See, e.g.</u>, <u>Persico v. City of Jersey City</u>, 67 F.
App'x 669, 676 (3d Cir. 2003) (holding that the Plaintiff's
<u>Monell</u> claim had no merit because he submitted no evidence other
than his own assertions of a municipal policy or custom to
discriminate).  Consequently, the City of Vineland and Chief
Codispoti are entitled to judgment in their favor on Plaintiff's
claim of municipal liability.

### 3.   Plaintiff's state law assault and battery claim

A person is subject to liability for the common law tort of
assault if: "(a) he acts intending to cause a harmful or
offensive contact with the person of the other or a third
person, or an imminent apprehension of such a contact, and (b)
the other is thereby put in such imminent apprehension." <u>Leang</u>

v. Jersey City Bd. of Educ., 969 A.2d 1097, 1117 (N.J. 2009)

(citation omitted).  The tort of battery rests upon a

nonconsensual touching.  Id. (citation omitted).  Based on the

events as described by the parties relating to the December 1,

2011 arrest, Plaintiff's assault and battery claim arising out

of that arrest may proceed.[6]

---

[6] The notice provision of the New Jersey Tort Claims Act,
N.J.S.A. 59:8-3, applies to both intentional and non-intentional
torts asserted against public employees.  Lassoff v. New Jersey,
414 F. Supp. 2d 483, 490 (D.N.J. 2006) (citing Velez v. City of
Jersey, 180 N.J. 284, 286, 850 A.2d 1238 (2004)).  Moreover,
under the NJTCA, "A public employee is not liable if he acts in
good faith in the execution or enforcement of any law. Nothing
in this section exonerates a public employee from liability for
false arrest or false imprisonment." N.J.S.A. 59:3-3.  The
NJTCA strips a public employee of any immunity, however, if that
employee is found to have engaged in "willful misconduct."
N.J.S.A. 59:3-14(a).

It is not clear in this case whether Plaintiff complied
with the NJTCA.  The defense of failure to file notice under the
Tort Claims Act is an affirmative one which must be pleaded in
order to avoid surprise, and a defendant may be found to have
waived the protection thereof by failing to plead it as a
defense. Hill v. Board of Educ. of Middletown Tp., 443 A.2d
225, 227-28 (N.J. Super. Ct. App. Div. 1982).  Regardless,
whether Defendants could be immune under the NJTCA cannot be
determined at this time for the same reasons as Plaintiff's
excessive force claim.  This is because the same "objective
reasonableness" standard that is used to determine whether a
Defendant enjoys qualified immunity from actions brought
pursuant to 42 U.S.C. § 1983 is used to determine questions of
good faith arising under N.J.S.A. 59:3-3.  See Mantz v. Chain,
239 F. Supp. 2d 486, 507-08 (D.N.J. 2002) (citing Lear v.
Township of Piscataway, 566 A.2d 557 (N.J. Super. Ct. App. Div.
1989)).  Furthermore, N.J.S.A. 59:3-14(a) strips a public
employee of any immunity if that employee is found to have
engaged in "willful misconduct."  Willful misconduct is "the

36

## CONCLUSION

For the reasons expressed above, Plaintiff's excessive force claim and assault and battery claim arising out of the December 1, 2011 arrest may proceed against Defendants Mollik and Torres.  Summary judgment is granted as to all other claims by Plaintiff against the other Defendants.

An Order will be entered.


Date:   April 1, 2016                    s/ Noel L. Hillman
At Camden, New Jersey             NOEL L. HILLMAN, U.S.D.J.

_____

commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden . . . . [I]t requires much more than an absence of good faith and much more than negligence." PBA Local No. 38 v. Woodbridge Police Dep't, 832 F. Supp. 808, 830 (D.N.J. 1993) (internal quotations omitted)). Because there exists a genuine issue of material fact regarding whether Defendants engaged in willful misconduct, the Court cannot determine as a matter of law whether the NJTCA would shield them from liability for their conduct during the December 1, 2011 incident.